ISAAC SNYDER

*v.*

ALEXANDER PARTRIDGE et al.

*Filed at Springfield June 10, 1891.*

1. MORTGAGE—*mistake in description — liability of purchaser with notice—inadequate consideration.* A, the owner of the south half of a quarter of land, worth $3550, borrowed of B $1000, and attempted to give a mortgage thereon to secure the loan, but by mistake the mortgage described the north half of the quarter. C, with knowledge of the mistake, bought the land intended to be mortgaged for $1000, and, for the purpose of concealing his purchase, took the deed from A in the name of D, who also had notice of the mortgage, and C, or C and D, sold the land to E, an innocent purchaser without notice, for $3550, and A and his wife, for the consideration of $50, quitclaimed to E to pass the dower of A's wife. On bill by B to reform and foreclose the mortgage against the other parties, it was *held,* that C and D were bound to account to B for all the purchase money received from E, and interest thereon, except the $1050 paid by them, or one of them, to A, with lawful interest from the time of payment, and that E was liable with them for such portion of the purchase money as he had paid to either of them since he was served with process in the suit.

2. Where, by a mistake, a mortgage is given on a wrong tract of land, and a party having notice of the mistake buys the land intended to be mortgaged, advances the purchase money,—about one-fourth the value of the land,—and takes a deed in the name of another who has notice, and makes a sale to an innocent purchaser, who receives a deed,

a court of equity will require such party who procures the deed from the mortgagor to account to the mortgagee for the profits made on his purchase, over and above what he has paid for the land.

3. In cases of mistake in written instruments, courts of equity will not only interfere as between the original parties, but also as against voluntary grantees and purchasers.

4. Where the fraudulent purchaser of land on which another is in equity entitled to a mortgage lien, disposes of the property to an innocent purchaser, so that the land can not be reached, a court of equity will treat the purchase money realized by the fraudulent purchaser over and above the sum actually paid by the latter, as subject to the payment of the mortgage.

5. Where the consideration paid is small in comparison with the real value of the property, and when the circumstances of the case are extremely unfavorable to the fairness of the transaction, though not sufficient to establish absolute fraud, the conveyance will be regarded as a voluntary one to the extent of the difference between the actual consideration and the real value of the property, and to that extent will be treated as fraudulent and void as to existing creditors.

6. Same — *lien on surplus from sale under prior incumbrance.* A mortgage lien will attach to the surplus arising from the sale of the premises under a prior incumbrance.

7. Same—*correcting erroneous description.* Where a party secures a loan by mortgage or deed of trust, intended by the parties to be upon the south half of a quarter owned by the debtor, but which, by mistake, is described as the north half of the quarter, to which he had no title or claim, as between the parties thereto the creditor will be entitled to have the trust deed reformed and foreclosed against the land intended to be described, but not as against a subsequent *bona fide* purchaser without notice of the mistake.

8. Agent—*knowledge of, when notice to principal.* It is a general rule, that when an agent has acquired information before the commencement of his agency, the principal will not be charged with constructive notice thereof. One reason of the rule is, that no man can be supposed always to carry in his mind the recollection of former occurrences. Another is, that where the agent is an attorney or counsel, it might be contrary to his duty to reveal the confidential communication of his client.

9. The English rule is, that if the agent, at the time of the purchase, has knowledge of any prior lien, trust or fraud affecting the property, no matter when he acquired such knowledge, his principal is affected thereby. The Supreme Court of the United States has approved this rule, subject to the qualifications that the knowledge of the agent is present to his mind at the time of effecting the purchase, and that the

agent is at liberty to communicate his knowledge to his principal, and that it is his duty to do so.

10. But the rule that the knowledge of the agent must be acquired during his agency, and in the course of the same transaction from which the principal's rights and liabilities arise, in order to affect the latter with notice, has no application when it is clear from the evidence that the information obtained by the agent in a former transaction was so precise and definite that it is or must be present to his mind and memory while engaged in the second transaction, and when the agent is at liberty to communicate his information to the principal.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Taze-well county; the Hon. N. W. GREEN, Judge, presiding.

Messrs. HOPKINS & HAMMOND, for the appellant:

The consideration paid by Barton for the land was $1000, while its actual value was about $4000. Therefore, the conveyance is voluntary as to the difference between these sums, and fraudulent and void as to existing creditors and *bona fide* equitable incumbrances, and Barton, by selling and converting the land into money, has become the equitable trustee of Snyder for the proceeds, to the extent of such difference, with the rents and profits, or so much thereof as may be necessary to satisfy appellant's claim equitably secured thereon. *Strong* v. *Lawrence*, 58 Iowa, 55; Bump on Fraud. Con. 282, 289; *Norton* v. *Norton*, 59 Mass. 524; *Robinson* v. *Stuart*, 10 N. Y. 189; *Church* v. *Chapin*, 35 Vt. 223.

He who takes a voluntary conveyance of land takes it subject to all equities concerning it existing against the grantor at the time of the conveyance. *Boyd* v. *Dunlap*, 1 Johns. Ch. 482; *Howe* v. *Weldon*, 2 Ves. 526; *Keeder* v. *Orvis*, 43 Iowa, 413; *Strong* v. *Lawrence*, 58 id. 55.

The deed from Harris to Barton was made in fraud, with intent to defeat appellant's security, and Barton, by selling and converting it into money, became trustee of the entire proceeds.

As to notice of appellant's equities, see *Russell* v. *Ranson,* 76 Ill. 167; *Ogden* v. *Haven,* 24 id. 57; *Robinson* v. *Rowan,* 2 Scam. 499; *Cox* v. *Milner,* 23 Ill. 476; *Chicago* v. *Witt,* 75 id. 211; *Heaton* v. *Prather,* 84 id. 330; *Harper* v. *Ely,* 56 id. 179; *Heneberry* v. *Morse,* 56 id. 394; *Babcock* v. *Lisk,* 57 id. 327; *Flint* v. *Lewis,* 61 id. 299; *Shepardson* v. *Stevenson,* 71 id. 646; *Redden* v. *Miller,* 95 id. 336; *Clark* v. *Plumsted,* 11 Bradw. 57; *Dayton* v. *Nat. Bank,* id. 501; *Parker* v. *Merritt,* 105 Ill. 293; *Nat. Bank* v. *Dayton,* 116 id. 257; *Hoopston* v. *Green,* 16 Bradw. 204.

Partridge, by his complicity in the fraudulent conspiracy to defeat appellant's security, has become equitably liable to appellant for whatever injury he sustains by reason of the fraudulent conspiracy.

Mr. WILLIAM DON MAUS, for the appellees:

Appellees deny that in regard to Barton there are any grounds for this court to decide that he holds by voluntary conveyance as to three-fourths of the value of the land, as trustee for Snyder; that he is chargeable, under the authorities cited by appellant, with notice of Snyder's equities, or that equity will charge the proceeds in Barton's hands with the rights of Snyder to the extent of his claim, or of any part thereof; that the notice Barton had of Snyder's equities after he had purchased of Harris constituted him a trustee, and liable to account in equity to Snyder; that by the evidence Barton took the title in bad faith, with intent to defraud Snyder of his security; that the consideration was inadequate, under the circumstances appearing; that Barton was voluntarily silent as to any natural inquiry; that Barton knew anything of the mortgage; that the mortgage, as recorded, afforded any notice, actual or constructive, or that it appears that Barton procured a false consideration to be put in his deed, or that he knew that he was buying the land for several times less than it was worth,—he bought it cheap because of the claim of Harris'

wife in the land,—or that it appears that Harris' story is true, and the only one consistent with the facts in the case.

As to the alleged conspiracy by and between Barton, Partridge and Seibold, to defeat appellant's security, we submit there is no evidence whatever in the record to sustain the point.

If it be admitted that Barton had notice of Snyder's equities, yet if Seibold, without such notice, purchased of Barton for a valuable consideration, Seibold's title shall not be defeated because it came through a contaminated source. *Willis* v. *Henderson,* 4 Scam. 13; *Prevo* v. *Walters,* id. 35; *Wait* v. *Smith,* 92 Ill. 385.

The conveyance as to Seibold was not a voluntary one, nor was the record of the mortgage of such a description of the premises as that referred to in *Nat. Bank* v. *Dayton,* 116 Ill. 257.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the Court:

This is a bill filed in the Circuit Court of Tazewell County on August 21, 1885, by Isaac Snyder, the appellant, against John A. Harris, and his wife Elizabeth Harris, and Alexander Partridge, William C. H. Barton and August Seibold. The bill, as originally filed and as subsequently amended, seeks to reform a mortgage, or trust deed, by correcting a mistake in the description of the land, and to forclose the same, and, in case the land intended to be mortgaged has been conveyed to the defendant Seibold without notice on his part of complainant's rights, to require the other defendants to pay the mortgage debt. The bill also prays for other and further relief. Default was entered against Harris and his wife, and the other defendants answered the bill. The court below, after a hearing of the cause at the November Term, 1889, upon pleadings and proofs, dismissed the bill for want of equity. This decree of dismissal has been affirmed by the Appellate Court, and the

judgment of the latter court is brought before us for review by appeal.

On June 18, 1873, John A. Harris borrowed $1000.00 of the complainant, Isaac Synder, giving his note payable five years after date, with interest at 10 per cent per annum. At that time Harris owned 80 acres of land, being the South half of the N. W. ¼ of Sec. 11, Town. 26 N. R. 4 West in Tazewell County, and, to secure the note, he and his wife on the same day executed a trust deed to John Snyder, as trustee, intending thereby to convey the south half of said quarter section. This trust deed was recorded on June 20, 1873, but, by mutual mistake of both parties, the land mentioned in the trust deed was described as the *north* half of the N. W. ¼ of section 11 instead of the *south* half thereof. Harris had no interest whatever in the north half of the quarter section, which was owned and occupied by other parties. Complainant was not able to read or write, and the attorney, upon whom he relied to draw the trust deed, wrote "*north*" when he should have written "*south*." The mistake was not discovered by the complainant until a few weeks before the present bill was filed.

It is not disputed that the mistake in question was made, and that it was mutual, and that it remained unknown to any of the parties interested for many years, and that the intention was to mortgage the south half of the quarter section which was the land on which Harris lived, and the only land which he owned. Harris has never paid more than about $50.00 upon the indebtedness, and at the time of filing the bill was insolvent, and for a long time prior thereto had owned no other property except such interest as he had in this land.

Under these circumstances there can be no doubt that the complainant, as between himself and Harris, would be entitled to have the trust deed reformed and foreclosed against the land intended to be described.

But, by quit-claim deed dated July 1, 1885, acknowledged July 3, 1885, and recorded July 8, 1885, Harris alone, his wife

not joining with him, conveyed the north 78 acres of said south half to the defendant Barton. By quit-claim deed, dated August 14, 1885, acknowledged August 15, 1885, and recorded August 17, 1885, Barton and wife conveyed the said north 78 acres of said south half to the defendant, Seibold. Also, for the purpose of conveying the dower of Mrs. Harris, a quit-claim deed conveying said 78 acres to Seibold, bearing date August 14, 1885, and signed by Harris and his wife, was by them acknowledged on August 15, 1885, and recorded August 17, 1885.

It will be noted, that the deeds to Seibold were recorded four days before the present bill was filed. Neither the deed from Harris to Barton, nor the deeds from Barton and wife and from Harris and wife to Seibold, make any reference to the Snyder mortgage. At the respective dates of the execution of those deeds the record showed no mortgage upon the south half of the quarter section, and it is claimed on behalf of the appellees that Barton and Seibold were bona fide purchasers without notice of Snyder's mortgage, or of the mistake in the description therein. The proof shows, that Harris received $1000.00 for his conveyance to Barton, and that Seibold paid for the deeds to him $1550.00 in cash, and executed to Barton a mortgage, dated August 15, 1885, and recorded August 22, 1885, to secure three notes, two for $500.00 each due in one and two years, and one for $800.00 due in three years, all drawing interest at six per cent. per annum.

The original bill charges, that Barton and Seibold had notice, before the execution of the deeds to them, of the existence of complainant's mortgage upon the north half of the quarter section, and of the error in the description, and of the intention of both Harris and Snyder to mortgage the south half, and that the deeds to Barton and Seibold were made for the purpose of cheating and defrauding the complainant out of his security, and to place the title beyond his reach.

The bill as amended, makes Alexander Partridge a defendant, and, in addition to the charges in the original bill, makes the further charge, that Partridge knew all about the trust deed from Harris to Snyder, and the mistake in the description, and that Partridge paid Harris the $1000.00 himself, and conspired with Barton to act as an innocent purchaser, and procured the deed to be executed to Barton instead of himself, and that Barton assisted in the fraud, and conveyed the land to Seibold to abet and protect Partridge in the fraud, and that, if the land cannot be reached by bringing home knowledge to Seibold, Barton and Partridge are equitably liable for the amount due upon complainant's note and mortgage, and that Harris is wholly irresponsible, etc.

It is a well settled doctrine, that, in cases of mistake in written instruments, courts of equity will not only interfere as between the original parties, but also as against voluntary grantees, and purchasers with notice of the facts. (1 Story's Eq. Jur. sec. 165 and cases cited in the notes; *Wyche* v. *Green*, 11 Geo. 173; *Sickmon* v. *Wood*, 69 Ill. 329; *Russell* v. *Ranson*, 76 id. 167; *Erickson* v. *Rafferty*, 79 id. 209; *Bent* v. *Coleman*, 89 id. 364.)

We do not think, that the evidence establishes notice to Seibold of complainant's equities. There are many circumstances which lead to the suspicion that he may have known of complainant's mortgage and of the mistake therein. But the proof is not clear that Seibold had actual notice, or notice of such circumstances as were sufficient to put him upon inquiry.

The case is, however, very different with Barton. The proof in regard to him gives rise to more than mere suspicion; it tends very strongly to show, either that Partridge was the real purchaser, and had placed the title in Barton for purposes of concealment, or that Barton had notice of complainant's equities, or of such circumstances as were calculated to put him upon inquiry. Partridge was connected with this whole trans-

action from beginning to end. He had at one time been in business in the matter of running a ferry with Snyder. He induced Snyder to lend the $1000.00 to Harris in June, 1873; $429.50, borrowed by Harris of Snyder in 1879, was used in part to pay a judgment rendered against Harris & Partridge. Partridge was exceedingly intimate with Barton, and worked for him "quite awhile running a mill," and did "sawing" for Barton at his own mill, and bought a mill of Barton, and had many dealings with him, and at one time borrowed $5000.00 of Barton to use in his bridge business. He was also very intimate with Harris. He supposed for years that the Snyder trust deed rested upon the south half of the quarter section, but he discovered, that the trust deed had been placed by mistake upon the north half, long before the conveyance of Harris to Barton. Some of the witnesses testify, that Partridge knew of this mistake a number of years before Harris made the deed to Barton. Partridge himself admits, that he knew of it in the winter before July, 1885. He tried for a long time to sell the land for Harris so as to pay off the Snyder mortgage, but says that he took no steps to sell it for Harris after he found that the trust deed was on the wrong land. A number of witnesses testify, that Partridge had spoken to them of some business difficulty he had had with Snyder, and that they had heard him threaten to prevent Snyder from making anything out of his trust deed. The records show, that in 1874 Harris deeded to Partridge and Snyder a strip of land two rods wide "off of the full length of the south side of" said north west quarter "for the purpose of a public road, should one be established to a ferry or a bridge across the Illinois river," etc. Hence, the deed to Barton only conveyed 78 acres.

Harris swears, that he sold the land to Partridge; that all he received was $1000.00; that Partridge paid him the money, and that he knew it was Partridge's money; that he had no negotiations or conversation with Barton until his trade with Partridge was closed; that Partridge requested him to make

the conveyance to Barton, giving as a reason that Snyder was aware of his (Partridge's) knowledge of the mortgage, "but that the land could be sold to a third party, who would appear as an innocent purchaser"; that, by previous arrangement, Barton was to go the next day to the office of an attorney named Cameron, and receive the deed; that on the next day the deed was delivered to Barton in Cameron's office. Harris, says: "For several years before this sale I had requested Partridge to try to find me a purchaser for the land. He did not do so, but bought it himself."

Mr. Cameron, the attorney, confirms the testimony of Harris upon this point. He says: "He (Harris) told me that he had an offer from Alexander Partridge of $1000.00 and afterwards he told me that the deed was to be made to W. C. H. Barton. * * * I told him it made no difference whom he deeded it to, if Partridge directed it. * * * Think I was present when the deed from Harris to Barton was made." Cameron also swears, that the first time Partridge came to see him about it, Partridge told him that he had offered $1000.00 to Harris, and had been instructed by Harris to come and see him (Cameron) about it, and that he, Cameron, tried to induce Partridge to raise his offer, but he refused to do so, and said, "I have offered that, and will give nothing more, and you had better advise Harris to take it."

Partridge and Barton contradict Harris and Cameron upon this subject. Partridge is contradicted in material matters by so many witnesses, and his evidence is so full of manifest misstatements, that we give little credit to it. Barton's evidence shows, that he knows very little about the transaction. He admits that he had a stroke of apoplexy, and had been in poor health for four or five years before testifying. He does not even know whether he is a party to the present suit or not. He cannot tell how he became informed that Harris would sell the land. He speaks of giving up some notes to Harris when the $1000.00 was paid, but cannot state the ex-

act amount of them; and neither Harris nor Cameron, both of whom were present, speak of seeing the notes. He says that his memory is poor. He cannot tell where he got the money which he claims to have paid to Harris. He cannot tell how much money Seibold paid him in cash when the latter bought the land. He could not swear that Seibold paid him more than $500.00, and thinks that the amount was $700.00, whereas Seibold swears, and other proof shows, and it is not denied, that Seibold paid him $1500.00 in cash. On his cross-examination he denies what he said on his direct examination as to Seibold's statements to him.

If Barton bought the land himself, then there are many circumstances, which tend to show, either that he had notice, or was put upon inquiry. The consideration expressed in the quit-claim deed made to him by Harris was $3500.00, when, as matter of fact, he only paid $1000.00. The uncontradicted testimony shows that the land, which he was getting for $1000.00, was worth $4000.00. Either before or immediately after he received his deed from Harris, Partridge began to negotiate a transfer to Seibold. Barton says he was furnished with an abstract and had it examined. The taxes of 1884 were a lien on the land on May 1, 1885, and it was the duty of Harris to pay them. Inquiry would have shown that on May 26, 1885, the taxes of 1884 were paid not by Harris, but by Snyder, at the county collector's office. The records showed that the whole south half of the quarter section, including said 78 acres and the 2 acres transferred to Partridge & Snyder, was sold for the taxes of 1883 on June 20, 1884. Inquiry of Snyder as to the non-payment of his proportion of the taxes on the whole 80 acres may have led to the discovery of Snyder's mortgage. Barton admits, that, before he delivered to Seibold the deeds executed by himself and wife and Harris and wife, and before he had received any purchase money from Seibold, he was told by one Hoshor that Snyder claimed to have a mortgage on the land. Hoshor's testimony

is to the effect that Barton merely asserted, that the abstract of the record did not show any mortgage in favor of Snyder, without denying that he had knowledge of it. Barton knew that Harris had had difficulty with his family, and had separated from his wife, and was anxious to get his $1000.00, and leave the State. The evidence is also clear that Barton had known the land ever since boyhood, and was acquainted with its value. If he bought the land himself, Partridge was his agent in the matter. The negotiations with Harris and with Cameron were carried on by Partridge, as has already been shown. Partridge obtained the deed from Mrs. Harris and her husband, in order to release the dower claim, as late as August 15, 1885, and paid Mrs. Harris $50.00 for signing the deed. He conducted all the negotiations in relation to the transfer of the property to Seibold. If he was acting, not for himself but as agent for Barton, then his notice of Snyder's mortgage will be regarded as notice to Barton. It is a general rule that, where an agent has acquired information before the commencement of his agency, the principal will not be charged with constructive notice thereof. One reason of the rule is, that no man can be supposed always to carry in his mind the recollection of former occurrences. (*Hood* v. *Fahnestock*, 4 Watts, 489.) Another reason is, that, where the agent is an attorney or counsel, it might be contrary to his duty to reveal the confidential communications of his client. (Idem; also, *McCormick* v. *Wheeler*, 36 Ill. 114.)

But the rule, that the knowledge of the agent must be acquired during his agency and in the course of the same transaction from which the principal's rights and liabilities arise in order to affect the principal with notice, has no application where it is clear from the evidence, that the information obtained by the agent in a former transaction was so precise and definite, that it is or must be present to his mind and memory while engaged in the second transaction, (2 Pomeroy's Eq. Jur. sec. 672 and cases cited in note) and where

the agent is at liberty to communicate his information to the principal. (*Williams* v. *Tatnall*, 29 Ill. 553; *Dunlap* v. *Wilson*, 32 id. 517; *The Distilled Spirits*, 11 Wallace, 356.) The English rule is, that, if the agent at the time of the purchase has knowledge of any prior lien, trust or fraud affecting the property, no matter when he acquired such knowledge his principal is affected thereby. The Supreme Court of the United States have approved of the English rule subject to the qualifications, that the knowledge of the agent is present to his mind at the time of effecting the purchase for his principal, and that the agent is at liberty to communicate his knowledge to his principal, and that it is his duty to do so. (*The Distilled Spirits, supra.*)

In the case at bar, Partridge was not an attorney and did not acquire his information while sustaining a confidential relation to anybody. He acquired it from outside parties, and by employing an attorney to examine the records for him. The testimony of Harris, of Cameron, of other witnesses, and his own evidence, show clearly that the knowledge of the Snyder mortgage was present to the mind of Partridge during all the negotiations.

It follows, that, if Partridge bought this property for himself in Barton's name, the purchaser had notice of Snyder's equities. If Barton bought it, he either had constructive notice of Snyder's rights through the knowledge of his agent, or actual knowledge, or knowledge of circumstances sufficient to put him upon inquiry. Under these circumstances, we think that Barton and Partridge are bound to account to Snyder for all the purchase money received from Seibold and interest thereon, except the $1000.00 or $1050.00 paid by them, or one of them, to Harris with lawful interest from time of payment; and Seibold is liable with them for such portion of the purchase money as he has paid to either of them since he was served with process in this suit. This holding is based upon the principles of law hereinafter announced. Where the con-

sideration paid is small in comparison with the real value of the property, and where the circumstances of the case are extremely unfavorable to the fairness of the transaction, though not sufficient to establish absolute fraud, the conveyance will be regarded as a voluntary one to the extent of the difference between the actual consideration and the real value .of the property, and, to that extent, will be treated as fraudulent and void as to existing creditors. (*Boyd* v. *Dunlap,* 1 Johns. Ch. Rep. 479; *Keeder* v. *Murphy,* 43 Iowa, 413; *Worthington* v. *Bullet,* 6 Md. 172; *Strong* v. *Lawrence,* 58 Iowa, 55; *Norton* v. *Norton,* 5 Cush. 524; *Church* v. *Chapin,* 35 Vt. 223; *Robinson* v. *Stuart,* 10 N. Y. 189.)

In the case at bar the proof shows that the property was worth $4000.00, while Barton and Partridge, either one or both of them, only paid for it $1000.00 or $1050.00. As, however, the sum of $4000.00 is the value as fixed by the opinions of witnesses, we accept $3350.00, the amount of the sale to Seibold, as the value upon the basis of which the defendants should account. Snyder is entitled to have $2300.00 of this sum applied to the payment of his debt.

We are aware that the doctrine, which holds a conveyance for less than the real value to be voluntary so far as the value exceeds the consideration paid, has been ordinarily applied where the creditor seeking to reach the property has obtained a judgment and filed a creditor's bill. But in the present case the court had jurisdiction to correct the trust deed and enforce it as thus corrected against the south half of the quarter section. Inasmuch, however, as the land cannot be reached, the court will seize hold of the money which the sale of the land has realized. The fund stands in the place of the land, and the lien, which would have attached to the land but for its transfer, will be permitted to attach to the fund produced by the transfer.

It is a well settled principle of law, that a mortgage lien will attach to the surplus arising from the sale of the prem-

.ises under a prior encumbrance. (1 Jones on Mtges. (4 ed.) sec. 708; *Bartlett* v. *Gale*, 4 Paige Ch. Rep. 503.) Here, the bona fide purchaser, Seibold, has a right to hold the land. His equity is equal with that of Snyder. (1 Story's Eq. Jur. sec. 165.) It may be said, also, that Barton, or Partridge, may be regarded as having a prior right to hold the sum of $1000.00 or $1050.00 out of the proceeds of sale to reimburse themselves for what they advanced to Harris. To the extent of the $1000.00 or $1050.00 they are prior lienors or incumbrancers. But as to the surplus of $2300.00, we see no reason why the equitable rights of the appellant cannot attach to it, the same as if he was a subsequent encumbrancer entitled to the surplus arising from a sale under a prior encumbrance.

As to the mortgage for $429.50 held by Snyder against Harris, and which was never recorded, we find no evidence of notice that is sufficient to bind any of the parties.

The judgment of the Appellate Court and the decree of the Circuit Court are reversed, and the cause is remanded to the latter court for further proceedings in accordance with the views herein expressed.

*Judgment reversed.*