## DAILY v. UNIVERSAL OIL PRODUCTS CO.

Civil Action No. 43 C 1162.

District Court, N. D. Illinois, E. D.
Nov. 26, 1947.

John A. Marzall, Richard L. Johnston, Carl Hoppe, and Spencer, Marzall, Johnston & Cook, all of Chicago, Ill., and George F. Wasson of Los Angeles, Cal., for plaintiff.

Floyd E. Thompson, of Chicago, Ill., and Ralph S. Harris and John R. McCullough, both of New York City, for defendants Universal Oil Products Co., a South Da-

kota corporation, Universal Oil Products Co., a Delaware corporation, and Carbon P. Dubbs.

James H. Cartwright, Arthur D. Welton, Jr., and Winston, Strawn & Shaw, all of Chicago, Ill., for defendant Robert J. Dunham.

John F. Cashen, Jr., Louis S. Hardin, John J. Waldron, and Pam, Hurd & Reichman, all of Chicago, Ill., for defendant Lolita Sheldon Armour.

Richard F. Babcock, of Chicago, Ill., Sidney G. Craig, of Evanston, Ill., and Sidley, Austin, Burgess & Harper, of Chicago, Ill., for defendant Joseph A. Alther.

Owen Rall, Tim G. Lowry, and Eckert & Peterson, all of Chicago, Ill., for defendant W. A. Levering.

IGOE, District Judge.

Plaintiff, Dean Cauffield Daily, is the executor of the estate of Mary Belle Hardison, deceased. Plaintiff filed the complaint in this case on December 2, 1943, as the representative of the stockholders and creditors of the Sunset Oil Refining Company, a West Virginia corporation, which is and has been defunct for many years. At her death, in 1939, Mary Belle Hardison, as the heir of her deceased husband, W. L. Hardison, was the owner of certain shares of the capital stock of the Sunset Oil Refining Company.

The complaint as amended seeks equitable relief. The gist of the action is to establish a trust in regard to the profits and earnings which admittedly have accrued to the defendants and others from the transfer of certain patents and patent applications to the defendant, Universal Oil Products Company, a South Dakota corporation. The patents covered processes for the treatment and cracking of crude oil. The majority of the patents involved and particularly those from which great profits were derived were, at one time, in the possession of and used by the Sunset Oil Refining Company.

The alleged right now asserted by the plaintiff to recover a share of the profits derived by the defendants from the patents and patent applications referred to is based on the ownership by the Hardisons of a minority stock interest in the Sunset Oil Refining Company. Plaintiff alleges and contends that Sunset Oil Refining Company owned the patents and patent applications when they were transferred.

The defendants named in the complaint are:

1. Universal Oil Products Company, a South Dakota Corporation, the transferee of the patents and patent applications involved. The offices of this defendant are in Chicago, Illinois.

2. Universal Oil Products Company, a Delaware Corporation, the purchaser, on January 1, 1932, of all of the assets of the South Dakota corporation. The offices of this defendant are in Chicago, Illinois.

3. Carbon P. Dubbs, son and former associate of his father, Jesse A. Dubbs. Jesse A. Dubbs died in 1918. He owned the majority of the shares of the capital stock of the Sunset Oil Refining Company and he was the transferrer of the patents and patent applications.

4. Lolita Sheldon Armour, wife of J. Ogden Armour and transferee of certain shares of the capital stock of the South Dakota corporation, formerly owned by Armour.

5. Hiram J. Halle, Robert J. Dunham, John J. Mitchell, Joseph G. Alther, W. A. Levering, F. W. Croll, E. C. Ennis and E. Whitcomb, all of whom were connected with Universal Oil Products Company, the South Dakota corporation, in the organization and management of the company or through ownership of its capital stock.

6. All unknown participants in the conversion of three hundred shares of the capital stock of Universal Oil Products Company, a South Dakota corporation, which allegedly formed a part of a trust res held by Jesse A. Dubbs for the benefit of the stockholders and creditors of Sunset Oil Refining Company.

Of the foregoing defendants, Carbon P. Dubbs, a resident of Bermuda, was dismissed as a defendant on April 11, 1944, for lack of jurisdiction. Hiram J. Halle was also dismissed as a defendant on the same date and he died in 1944 before the trial of the case.

A statement of some of the essential facts involved will be helpful in understanding the issues raised by the contentions of the respective parties.

Jesse A. Dubbs was an experienced and competent oil chemist. He died in 1918. For some time prior to 1900, he had engaged in the production of asphalt from crude oil. He owned and was the managing officer of the Globe Asphalt Company, a corporation with offices in Pittsburgh, Pennsylvania, which vended asphalt. He had experimented on and developed an air blown process for the production of asphalt from crude oil with an asphalt base. He filed an application for a patent and on April 3, 1900, United States Letters Patent No. 646,639 were issued to him on that process. Sometime before patent No. 646,639 was issued, Jesse A. Dubbs organized the Sunset Oil Refining Company as a corporation under the laws of the State of West Virginia, with one thousand shares of capital stock.

J. A. Dubbs needed capital to develop and use the patent No. 646,639 and to enable him to carry on his work in the petroleum business. On April 21, 1900, he entered into an agreement with W. L. Hardison of Los Angeles, California. This agreement provided that:

(1) Hardison would pay to Sunset Oil Refining Company one-fourth of all costs and expenses that the company had expended to that time in constructing its plant at Obispo Station in Los Angeles County, California.

(2) Hardison would pay Jesse A. Dubbs the sum of $10,000.00 on specified dates.

(3) Dubbs would assign and transfer to Hardison a one-fourth interest in the Sunset Oil Refining Company and the Globe Asphalt Company. (One-fourth interest in the Sunset Oil Refining Company comprised two hundred fifty shares of its capital stock.)

(4) Dubbs would grant to the Sunset Oil Refining Company, *its successors or assigns,* an exclusive license for the use and control of United States Letters Patent Numbered 646,639 dated April 3, 1900, to be used in the State of California or any place within the limits of the United States where the process would be applicable or advantageous to use in *treating* or *refining petroleum oils* having an asphaltum base. The exclusive license and control was to hold good so long as the Sunset Oil Refining Company should carry on in good faith the process of *refining* under the letters patent.

(5) Dubbs should be the President of the Sunset Oil Refining Company and should receive a salary of $2,500 per year. His son, E. J. Dubbs, should be superintendent of the plant and receive $125 per month.

(6) Hardison should be the Vice President and Treasurer of the company, with no salary being stipulated.

Following the execution of the foregoing agreement with Hardison, Dubbs, on May 5, 1900, entered into a written agreement with the Sunset Oil Refining Company, which agreement provided in substance:

The Sunset Oil Refining Company agreed to issue to J. A. Dubbs 990 shares out of a total of 1,000 shares of its capital stock in consideration of:

1. The sum of $12,000 that had already been paid into the company's treasury by Dubbs. This sum had been paid to Dubbs by Hardison.

2. Dubbs agreed to give and grant an exclusive license to the Sunset Oil Refining Company, *its successors or assigns,* for the use and control of letters patent No. 646,639 *and* any other patents that might be issued to Dubbs in relation to said process (the process involved in patent No. 646,639) which Dubbs agreed in like manner to transfer.

The exclusive license was for use of the process in any place within the United States where it would be applicable or advantageous to use in treating or refining petroleum oils having an asphaltum base and was to continue so long as the company, *its successors or assigns,* should in good faith carry on the process of such treating and refining petroleum oils under said letters patent.

All of the transactions enumerated in the foregoing agreements were consumated. Hardison paid $12,000 to Dubbs and

Dubbs in turn paid that sum in to the treasury of the Sunset Oil Refining Company. Hardison received two hundred fifty shares of the company's one thousand shares of capital stock and Dubbs retained the balance of seven hundred fifty shares. Business commenced. From the outset Jesse A. Dubbs controlled and ran the company in every respect. The evidence shows that he was truly the alter ego of the Sunset Oil Refining Company.

The business of the company was extensive. The main plant was a refinery located at Terminal Island, California, and was known as the Ostend plant, the Obispo plant and the San Pedro plant. The operations covered the entire field of oil refining. The production of asphalt from the residue of oil distillation was stressed but the refining operations included the segregation of all products of distillation, such as gasoline and illuminating oils. All of this business was in relation to the process under patent No. 646,639, which was issued on April 3, 1900. This relation appears in the description of the process in patent No. 646,639, which reads in part:

"The invention described herein relates to certain improvements having for these objects a large increase in the distillates produced and a refinement of the residuum to a merchantable form or condition." and: "resulting in the production of asphalt as a residue and at the same time producing distillates of a much lighter specific gravity than would otherwise result."

The patent was entitled "Distilling Petroleum." It described the process of distilling petroleum by the use of heat and with the addition of air. Sunset Oil exercised full control over the patent and the process which was used at least until 1911, when Sunset Oil by Jesse A. Dubbs, as its president, offered to sell the patent to the Union Oil Company.

In the conduct of the company's business, Jesse A. Dubbs was assisted to a considerable extent by his sons, L. A. Dubbs (Leland A. Dubbs) and C. P. Dubbs (Carbon P. Dubbs). Both the latter were employed and paid by the company. C. P. Dubbs was active in the development work

relating to patented processes and in the extension of the company's business. Hardison remained pretty much in the background. His official connection with the company apparently ended in 1907 or 1908. However, he retained his stock ownership in Sunset and upon his death in 1909, his stock passed to his widow, Mary Belle Hardison.

In the course of the company's operations, its work was developed and perfected. Additional patents were issued on the applications of Jesse A. Dubbs. While the later patents usually involved specific products that result from the distillation of crude oil, the genesis of each of the processes was based on or related to the process in patent No. 646,639. Thus patent No. 694,621 issued on March 4, 1902 to produce a smokeless and odorless illuminating oil; patent No. 694,622 also issued on March 4, 1902, to produce a smokeless and odorless illuminating oil by heating the vapors of the distillate; application No. 286,471 was filed by Jesse A. Dubbs on November 9, 1905. It was entitled "Treating Oil" and involved the general process described in the three prior patents but used a great deal more air; the process was generated by heat which caused the hydrogen in oil to combine with the oxygen in the air to form water. The process was used at the Sunset plant for several years. The application resulted in patent No. 1,100,717 which was issued to Jesse A. Dubbs on June 23, 1914, after several important events, which will be described later, had occurred.

An event of considerable significance to the business of Sunset Oil Refining Company and to the issues in the present litigation was the filing by Jesse A. Dubbs of patent application No. 286,472. This application was also filed on November 9, 1905, and it resulted in the issuance of United States Letters Patent No. 890,762 to Dubbs on June 16, 1908. This was during the active life of the company. The patent was likewise entitled "Treating Oil". It was the first patent to cover the process of separating water from oil.

The record shows that in 1903 and 1904 several oil fields were opened in California which produced a crude oil so emulsified

with water that it was not suitable for commercial use in its original form. Since the Sunset Oil Refining Company was engaged in the business of selling derivatives of California crude oil, its business was affected by the emulsified nature of the oil. Jesse A. Dubbs and C. P. Dubbs, his son, both of whom were then employed by Sunset Oil, experimented in ways of removing the water from the crude oil. These experimentations resulted in the filing of the application for and the issuance of patent No. 890,762. The process of removing water from crude oil wrought a chemical change which resulted in the cracking of the oil. The cracking process has since been effectively used to produce high grade fuel distillates. The evidence shows that Sunset Oil attempted to interest the Union Oil Company in the use or purchase of this process. Negotiations extended from 1905 to June, 1908. This is shown by the correspondence appearing on Sunset Oil letterheads.

As a means of establishing the water separating process in commercial use, Jesse A. Dubbs entered into an agreement with the Rice Ranch Oil Company, under which Sunset oil erected a water separating plant in 1909 on the Rice Ranch Oil Company lease at Santa Maria, California. In the course of the development of the project, the original plant was modified until the process became commercially profitable. Although the contract with the Rice Ranch Oil Company was signed by Jesse A. Dubbs, Sunset Oil Refining Company paid the cost of the erection and operation of the plant. The contract also provided for the payment of royalties to Jesse A. Dubbs, but the royalties were actually paid to the Sunset Oil Refining Company and they were recorded on the company books as its own income. Expenditures on the plant were also recorded in the company's books in an account entitled "Dubbs Method Company." There was no Dubbs Method Company, the only purpose of the account being to separate the expenditures on the plant from the other expenditures of Sunset Oil Refining Company.

The process covered by patent No. 890,-762 was limited to one "batch" in each op-

eration. During the operation of the plant on the Rice Ranch Oil lease, the process was improved so as to make possible the continuous treatment of the oil. On November 20, 1909, Jesse A. Dubbs filed application No. 529,049 for a patent on the improved continuous process and on January 5, 1915, letters patent No. 1,123,502 was issued to the National Hydrocarbon Company, a South Dakota corporation. The name of this corporation was subsequently changed to Universal Oil Products Company and it is one of the defendants in the instant suit.

The evidence shows and the defendants admit that in 1910, Sunset Oil Refining Company erected a plant at Obispo designed to practice the process that was then covered by patent application No. 529,049 which matured into patent No. 1,123,502 and that the plant was operated in the practice of that process. The evidence also shows that on November 29, 1909, Jesse A. Dubbs granted a license to Sunset Oil Refining Company under both patent No. 890,-762 and application No. 529,049 (the continuous process) to be used at the New Obispo plant. Under this license, Sunset agreed to pay a royalty of two cents per barrel to Jesse A. Dubbs.

None of the license agreements between J. A. Dubbs and Sunset Oil Refining Company, including the one of May 5, 1900, was recorded in the United States Patent Office.

W. L. Hardison died on April 10, 1909. Under his will, the ownership of his stock in Sunset Oil Refining Company passed to his widow, Mary Belle Hardison as residuary legatee. Consequently, at this point in the memorandum, it may be appropriate to examine into the rights and title, if any, that had become vested in the Sunset Oil Refining Company to the patents referred to above.

It has already been stated that patent No. 646,639 was licensed to Sunset by Dubbs on May 5, 1900, and that in the license agreement, Dubbs agreed to transfer to Sunset, its successors or assigns, any other patents issued to him in relation to the process covered by patent No. 646,-639. The patent states that its object is

356

to obtain a large increase in the distillates produced and a refinement of the residuum to a merchantable form. As to the other patents and processes that have been discussed, it appears that they likewise were licensed to Sunset. They all were in relation to the title of patent No. 646,639, that is, "Distilling Petroleum" and to the patent's stated purpose, namely to obtain a large increase in the number of distillates produced. The fair intendment of the license agreement of May 5, 1900, was to transfer to Sunset Oil Refining Company the complete ownership of patent No. 646,-639 within the United States so long as Sunset, its successors or assigns, should "in good faith carry on the process of such treating and refining petroleum oils under said letters patent". In the same instrument Dubbs also agreed to "in like manner transfer" any other patents that might be issued to him in relation to said process; to be used "in California or any place within the limits of the United States, where the process would be applicable or advantageous to use in treating or refining petroleum oils having an asphaltum base". The other patents, including patents No. 890,762 and No. 1,123,502 involved treating petroleum oils for the production of distillates. Thus, their kinship to patent No. 646,639 was as direct and close as separate identities would allow. The company's work in relation to patent No. 646,639 led to the other processes that were developed and covered by later patents.

■ It seems clear that the transfer of the exclusive use and control of the patent No. 646,639, and the process covered thereby, to Sunset Oil Refining Company under the agreement of May 5, 1900, constituted an assignment of the title of the patent. The definition of a grant of a patent is well stated in Paulus et al. v. M. M. Buck Mfg. Co. et al., 8 Cir., 129 F. 594, at page 596:

"The name by which a grant of a right under a patent may be called is not material. It does not condition or affect the rules of law which govern it. The exclusive rights secured by a patent are the right to make, the right to use, and the right to vend the invention it protects. A grant, transfer, or conveyance of these exclusive rights throughout the United States, or a grant of an undivided part of these exclusive rights, or a grant of these exclusive rights throughout a specified part of the United States, is an assignment of an interest in the patent, by whatever name it may be called. A grant, transfer, or conveyance of any right or interest less than these is a license."

■ The grant of the exclusive use and control of the process in patent No. 646,-639 was not less than the right to make, to use and to vend the process covered by the patent and the products created by the process. Waterman v. Mackenzie et al., 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; Paulus et al. v. M. M. Buck Mfg. Co. et al., 8 Cir., 129 F. 594; Heywood-Wakefield Co. v. Small et al., 1 Cir., 96 F.2d 496; Johnson Railroad Signal Co. v. Union Switch & Signal Co., C. C., 59 F. 20.

The interpretation of the language of the agreement of May 5, 1900, as a transfer of title to patent No. 646,639 and a promise similarly to transfer other patents related thereto was amply confirmed by the actions of both Jesse A. Dubbs and the Sunset Oil Refining Company. Patents were carried in the books and trial balances of the Sunset Oil Refining Company as assets having a value of $100,000. Jesse A. Dubbs was the president of Sunset Oil at all times was its alter ego, and he knew of those book entries. Although Dubbs, in January, 1909, licensed the Rice Ranch Oil Company to use the process under patent No. 890,762, royalties thereon were paid direct to Sunset. Sunset, by Dubbs, at various times offered to sell or license the different patents to other oil companies. Thus the title of Sunset Oil Refining Company to the patents was constantly advanced and acknowledged by the actions of both parties.

■ The facts in the instant case in respect to Dubbs' relations with the Sunset Oil Refining Company are similar to and perhaps stronger than those in the case of Dowse v. Federal Rubber Co., D. C., 254 F. 308, at page 310 where the court, in upholding a corporation's claim to a patent that had been issued to the corporation's president and general manager, said: "So the real test is whether Dowse occupied such

a relation to the corporation that he was its alter ego, in such a capacity that it is only consistent with good faith that he should recognize its ownership of the patent issued to him. Can he, without breach of his obligation toward his late employer, insist upon retaining and enforcing against it the patent he took out?" and, 254 F. at page 315: "It thus appears that plaintiff was not a mere employé under the direction of a superior officer. During the whole period he was president and general manager, and one of the directors."

■ Therefore, the court finds that by the terms of the written agreement of May 5, 1900, Jesse A. Dubbs was obligated to transfer and assign to Sunset Oil Refining Company the patents, patent applications and inventions heretofore discussed in this memorandum and that he did transfer and assign, either expressly or impliedly, said patents, patent applications and inventions to the Sunset Oil Refining Company. The court further finds that Sunset Oil Refining Company, in 1910, was the equitable owner of and possessed title to said patents, patent applications and inventions. Dowse v. Federal Rubber Co., D. C., 254 F. 308.

Whether title to the patents remained in Sunset until the patents were transferred in 1914, depended on whether the Sunset Oil Refining Company, its successor or assigns, continued in good faith to carry on at that time the process of treating and refining petroleum oils. To determine this, it is necessary to review briefly the financial history of the company.

As heretofore stated, The Sunset Oil Refining Company, immediately after its formation in May, 1900, engaged in the business of processing and selling asphalts and distillates of crude oil. The asphalt was sold by the Globe Asphalt Company, a corporation organized by Jesse A. Dubbs with offices in Pittsburgh, Pennsylvania. This company also used the offices of Sunset Oil Refining Company in Los Angeles, California. Between 1900 and 1906 Sunset Oil Refining Company became heavily indebted. In 1906, both companies arranged a loan from J. H. White of Pittsburgh, Pennsylvania, which was evidenced by a written agreement dated May 1, 1906.

The agreement with White provided that White would finance the business of the companies (Globe Asphalt and Sunset) to a sum not exceeding $25,000. To secure the loan, the companies agreed to procure an assignment of all of their capital stock to White, to assign certain of their claims to him and to pay him $2 per ton on all asphalt shipped by the companies after May 1, 1906.

Under the above agreement, by 1911, White and the Fidelity Trust Company of Pittsburgh, executor of his estate, had advanced approximately $80,000 to Sunset Oil Refining Company. None of this sum has been repaid. Strangely enough, in the same period, Jesse A. Dubbs actually withdrew from the company sums aggregating more than $150,000, although under his agreement with the company dated May 5, 1900, he was to receive a salary of $2,500 per year. It appears that the capital stock of Sunset Oil Refining Company was deposited with White and the Fidelity Trust Company of Pittsburgh as specified in the agreement of May 1, 1906, with the possible exception of 100 shares of Hardison's stock. The evidence shows that the 100 shares in question had previously been pledged by Hardison or someone else to the Los Angeles National Bank and were later redeemed by Sunset Oil Refining Company. At the trial of this cause, it was not proved that plaintiff, as successor in title to the Hardisons, owned these 100 shares or who the owner was other than Sunset Oil Refining Company.

One of the defenses advanced in the instant suit is the contention that Sunset Oil Refining Company did not have any equitable right to the patents involved because it ceased operations in 1911 and thereby breached the provision in the agreement of May 5, 1900, which conditioned the transfer of patent No. 646,639 on the continued carrying on in good faith by Sunset Oil Refining Company of the process of treating and refining petroleum oils under said patent. The Court believes that the contention that Sunset breached the condition referred to prior to the transfer by Jesse A. Dubbs of the patents in the spring of 1914 cannot be successfully maintained in view of the following facts:

Jesse A. Dubbs at all times was in complete control of the operations of Sunset. He never advised Sunset or W. L. Hardison that the agreement of May 5, 1900, had been breached by the company or terminated by Dubbs.

J. H. White, under his loan agreement of May 1, 1906, with Sunset, had a very substantial interest in the continued operations of Sunset Oil Refining Company since the agreement made repayment of the debt to White dependent on sustained and successful operations of the company. White died in 1909. Neither White nor the Fidelity Trust Company of Pittsburgh, executor of his estate, was ever advised by Dubbs that Sunset had ceased to carry on business in good faith, or that the company had forfeited the agreement of May 5, 1900.

Defendants do not contend that Mary Belle Hardison, the widow and legatee of W. L. Hardison and owner of the minority interest in Sunset Oil Refining Company after Hardison's death, was ever advised of a breach or forfeiture of the agreement of May 5, 1900, or that Sunset Oil Refining Company had ceased business.

The Sunset Oil Refining Company carried patents on its books as assets having a value of $100,000 and it always had possession of the patents.

The Obispo refinery was sold in 1914, in operating condition.

■ In this situation, it is the opinion of the Court and the Court finds that Sunset Oil Refining Company had not lost title to the patents and patent applications hereinbefore described because of a breach of the terms of the written agreement of May 5, 1900, between Jesse A. Dubbs and Sunset, when they were assigned by Dubbs to Dunham on May 15, 1914.

■ Since Jesse A. Dubbs was the admitted master and the alter ego of Sunset Oil Refining Company in which minority stockholders had an interest by virtue of a capital investment, he was legally charged with a trust to use and protect the company's assets for the benefit of stockholders. Southern Pacific Company v. Bogert et al., 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Wickersham v. Crittenden et al., 93 Cal. 17, 28 P. 788; Dixmoor Golf Club,

Inc., v. Evans, Jr., et al., 325 Ill. 612, 156 N.E. 785; Winger et al v. Chicago City Bank and Trust Company et al., 325 Ill. App. 459, 60 N.E.2d 560; Id., 394 Ill. 94, 67 N.E.2d 265.

■ The Court also is of the opinion that the circumstances as they then existed in respect of Sunset Oil Refining Company and the patents and patent applications would have provided notice to anyone negotiating for the purchase of the patents that the company owned an interest therein.

The evidence shows that in 1913, C. P. Dubbs, a son of Jesse A. Dubbs, was employed by the Standard Asphalt and Rubber Company, which company was largely owned and controlled by J. Ogden Armour of Chicago. Edward G. Leszynsky was president of this company and C. P. Dubbs advised Leszynsky of the patents that had been issued to his father. In the course of these conversations, C. P. Dubbs met Frank L. Belknap, a patent attorney in Chicago who represented the Standard Asphalt and Rubber Company. Belknap became interested in the Dubbs patents and later in the year 1913, C. P. Dubbs and Belknap went to Los Angeles to discuss the purchase of the patents with Jesse A. Dubbs. The conversations with the elder Dubbs culminated in the following events:

On the 15th day of November, 1913, Leszynsky and Jesse A. Dubbs entered into a written agreement wherein Dubbs represented that he was the owner of a considerable number of patents, which included the patents hereinabove described and also was the owner of certain applications for patents which included application Serial No. 529,049 entitled "Treating Oils" that was filed on November 20, 1909. This application was the one described previously as having resulted in the issuance of Patent No. 1,123,502 to National Hydrocarbon Company. It covered the continuous process of separating water from crude oil. As pointed out, this process involved the cracking of oil. In the agreement, Dubbs granted Leszynsky the option to purchase within three months a seven-tenths interest in the patents and patent applications referred to for which Dubbs was then to receive $2,500, and was to receive the

further sum of $25,000 when the option was exercised. The agreement also provided that Dubbs should receive thirty per cent and Leszynsky seventy per cent of all profits derived from the patents whether from the sale thereof or from royalties or from settlements for damages resulting from infringements.

In the event that Leszynsky exercised the option, the agreement provided that Dubbs was to execute an assignment of the patents, which assignment was to be placed in escrow, and thereafter receive thirty per cent of whatever profits accrued from the patents. If Leszynsky should assign his seventy per cent interest to a corporation, Dubbs was to assign his thirty per cent interest in the patents and receive back thirty per cent of the capital stock of the corporation. Leszynsky agreed, in event the option was exercised, to exploit the inventions and to obtain as much revenue as possible therefrom, including the bringing and prosecution of infringement suits. Dubbs agreed to give Frank L. Belknap full power of attorney to prosecute the patent applications for the purpose of ascertaining whether additional claims could be obtained. Dubbs was not to allow the patents to issue until proper investigations in that respect had been made.

The option was subsequently extended and on May 14, 1914, Jesse A. Dubbs, Leszynsky and Robert J. Dunham signed a trust agreement in exercise of the option. By this agreement Dubbs was to receive the sum of $22,500, for which he agreed to convey all of his right, title, and interest to said patents and patent applications to Dunham as trustee. He also agreed to request the Commissioner of Patents to issue all patents on applications pending in his name to Dunham as trustee.

In the trust agreement, Leszynsky agreed to organize a corporation to receive title to the patents from Dunham. Leszynsky was to receive seventy per cent of the capital stock of the corporation and Dubbs was to receive thirty per cent of the stock and thirty per cent of all profits accruing to the corporation. Leszynsky agreed to advance the funds necessary to exploit the inventions, these advances to be repaid by the corporation with seven per cent interest.

Both of the foregoing agreements contained the statement that Jesse A. Dubbs was the inventor and sole owner of the patents.

On May 15, 1914, Dubbs assigned to Robert J. Dunham, as trustee, the patents and patent applications Serial No. 286,471 filed on November 8, 1905; No. 529,049 filed on November 20, 1909; and No. 808,298 filed on December 22, 1913. In this instrument also, Jesse A. Dubbs represented that he was the inventor and sole owner of the inventions assigned.

The evidence shows that Leszynsky and Dunham were acting for J. Ogden Armour of Chicago, as their principal. It also shows that the money paid to Dubbs and the funds that were advanced for the exploitation of the inventions came from Armour.

The evidence related thus far fairly discloses the relationship between C. P. Dubbs and Sunset Oil Refining Company and between C. P. Dubbs and the patents involved. To this point it does not appear that C. P. Dubbs ever had or claimed an interest of ownership in the company or in the patents. However, shortly after Jesse A. Dubbs signed the option agreement with Leszynsky, he executed a writing on the basis of which C. P. Dubbs later claimed a proprietary interest in the patents. On the strength of that claim, defendants now seek to rest in part, their contention that they did not have notice of any claim of ownership by Sunset Oil Refining Company in the patents.

On November 20, 1913, five days after the option agreement was signed, Jesse A. Dubbs addressed and signed a memorandum to C. P. Dubbs which read as follows:

"For and in consideration of one ($1.00) dollar, the receipt of which is hereby acknowledged, and other valuable considerations, I hereby sell and set over to C. P. Dubbs, his heirs or assigns, the full one half (½) of my royalties or commissions, or monies I obtain or receive from time to time through contracts for use of United States Letters Patent No. 890,762, dated June 16th, 1908, and United States Patent Application No. 529,049, filed November 20, 1909."

The foregoing memorandum is important since Patent No. 890,762 was the first water separating patent and application Serial No. 529,049 was the continuous water separating process which involved the cracking process and later matured into Patent No. 1,123,502 that was issued to National Hydrocarbon Company on January 5, 1915. Defendants admit that the latter patent was the source of all the profits that were realized by Universal Oil Products Company, a South Dakota corporation. It is observed that the memorandum purports to effect a sale on November 20, 1913, by Jesse A. Dubbs to C. P. Dubbs of one half of the profits of the former which he might realize from contracts for the use of the patents.

Following the assignment of the patents to Dunham as trustee on May 15, 1914, Leszynsky organized the National Hydrocarbon Company in June, 1914, under the laws of South Dakota, with authorized capital stock of one thousand shares, each share of the par value of $100. On June 30, 1914, Robert J. Dunham executed a written assignment of the patents to the corporation. In the assignment Dunham represented that he was the owner of the patents and he requested the Commissioner of Patents to issue letters patent on the pending applications to the corporation.

In consideration of the assignment by Dunham, the corporation issued the one thousand shares of its capital stock. Three-tenths of the stock, or three hundred shares were issued to Jesse A. Dubbs, Trustee. The defendants say that the certificate was made out to "Jesse A. Dubbs, Trustee" at Dubbs' request. The remaining seven-tenths or seven hundred shares were issued as follows: two hundred shares to J. Ogden Armour; two hundred shares to E. G. Leszynsky; two hundred shares to R. J. Dunham; fifty shares to F. W. Croll; thirty shares to W. A. Levering; and twenty shares to F. L. Belknap.

About a year later the name of the corporation was changed to Universal Oil Products Company. Thereupon, all certificates of stock were surrendered and new certificates for identical numbers of shares were issued to the same parties.

The essential contentions of the parties may now be summarized:

In the complaint the plaintiff, as representative of Mary Belle Hardison's minority stock interest in the Sunset Oil Refining Company, contends that Sunset Oil Refining Company owned the patents and patent applications and seeks to ratify the transfers of the patents to Universal Oil Products Company. He contends that Jesse A. Dubbs received the three hundred shares of stock in the new company as trustee to hold for the benefit of himself and for the benefit of the other stockholders of Sunset Oil Refining Company; and that plaintiff is entitled to a proportionate share of the profits and money which eventually accrued to the holders of the three hundred shares; the proportion to be that of the respective stock interests in the Sunset Oil Refining Company, namely two hundred fifty shares to seven hundred fifty shares. However, in briefs which were filed after the case was tried, plaintiff now contends that since all of the stock of Universal Oil Products Company was issued in consideration of the transfer to it of the patents and patent applications referred to, plaintiff is entitled to the same proportionate interest in the entire one thousand shares of stock which were issued by that company, and in the profits that accrued thereon.

In answer to the plaintiff's claims, the defendants contend that they, and Belknap and Leszynsky also, did not have knowledge, actual or constructive, of any claims of Sunset Oil Refining Company to ownership in the patents; that Sunset Oil Refining Company did not own the patents; that they rightfully considered Jesse A. Dubbs as the sole owner of the patents and patent applications in accordance with his oral and written representations; that the request of Jesse A. Dubbs to have the three hundred shares of stock in Universal Oil Products Company issued to him as trustee caused no suspicion on their part because they knew of the memorandum addressed to C. P. Dubbs and signed by Jesse A. Dubbs on November 20, 1913. Defendants assert further that after the issuance of the stock they were advised by both Jesse A. Dubbs and C. P. Dubbs that the former was holding an undetermined part of his stock (the amount being in controversy) in trust for C. P. Dubbs and that the controversy in

that regard was settled by a letter dated February 23, 1917, from Jesse A. Dubbs to Robert J. Dunham, president of Universal Oil Products Company. The letter referred to the memorandum signed by Dubbs on November 20, 1913, and purported to authorize Universal to deal directly with C. P. Dubbs on the basis of that memorandum. The defendants therefore contend that they are free from any liability to the plaintiff in connection with the three hundred shares of stock of Universal Oil Products Company which were issued to Jesse A. Dubbs. They also contend that the balance of the stock that was issued by Universal Oil Products Company actually belonged to J. Ogden Armour to be disposed of as he saw fit; that the stock was issued in consideration of the reorganization of the corporation, the funds advanced in connection with the broadening of the claims in patent claim No. 529,049, and the funds which were to be advanced for the purpose of instituting and prosecuting patent infringement suits based on the broadened claims of the patent. Hence, the defendants contend that they are also free from any liability to the stockholders of Sunset Oil Refining Company in respect of the remaining seven hundred shares of the Universal stock.

The evidence shows that after the Universal Oil Products Company was formed, it directed most of its activities to broadening the claims of patent application No. 529,049 and to the prosecution of that application. The purpose was to cover the "Burton process of cracking" which process was owned by Standard Oil Company of Indiana. The application culminated in the issuance on January 5, 1915, of patent No. 1,123,502 to Jesse A. Dubbs, assignor to National Hydrocarbon Company. During the next seven or eight years all of the efforts of the company were devoted to the preparation and prosecution of a patent infringement suit against the Standard Oil Company of Indiana. The suit was based on the claims in patent No. 1,123,502 and was intended to and did establish the legal validity of the claims in the patent for a commercial gasoline cracking process. Over this period, Armour financed all of the company's expenses by loaning it from time to time various sums aggregating

more than $2,675,000. The litigation was concluded favorably to Universal Oil Products Company in 1922 and in 1926 the company became very successful and Armour's advances were repaid with interest. In 1931 all of the company's one thousand shares of stock, including the three hundred shares originally issued to Jesse A. Dubbs, trustee, were sold to United Gasoline Corporation at $25,000 a share for a total amount of $25,000,000. Plaintiff admits that United Gasoline Corporation was bona fide purchaser for value of the Universal stock.

The conclusion of the Court drawn from the facts stated thus far will be given before reciting the transactions which singularly affect the three hundred shares that were issued to Jesse A. Dubbs, Trustee.

The Court has already found that Sunset Oil Refining Company was the actual owner of the patents and patent applications when they were transferred by Dubbs to Dunham in 1914. However, the defendants contend, as previously stated, that even if Sunset Oil Refining Company had an equitable interest in the patents, neither the defendants nor Belknap and Leszynsky had, at the time the patents were acquired by Universal Oil Products Company, any knowledge, actual or constructive, of such an interest.

On the evidence in this case the Court is forced to the conclusion that the need of full and complete knowledge of the real ownership of patents and patent applications would have been paramount in the minds of ordinarily prudent persons who, to purchase the patents, consummated a business deal which involved:

1. An initial payment of $25,000 to the seller.

2. Future expenditures of more than $2,500,000 before the process covered by the patents could be established as commercially operable.

3. Contemplated litigation against a large oil company wherein the ownership of the patents would be a vital issue.

4. The issuance by the corporation which received title to the patents, of stock to the seller of the patents as trustee, this at the seller's direction.

362

5. The expectation of the purchasers of reaping large profits.

The matter of the ownership of the patents being of paramount concern to purchasers thereof, when Leszynsky and Belknap discussed the purchase of the patents with Jesse A. Dubbs in Los Angeles, they were confronted with many vital, contemporaneous facts: they met Jesse A. Dubbs in the office of the Sunset Oil Refining Company with the name of the company plainly printed on the door to the office; the name of the company was plainly printed on the safe in the office where the patent file was kept; Jesse A. Dubbs, from whom they sought to buy the patents, was president and the alter ego of Sunset Oil Refining Company, with his name and title plainly printed beneath the company's name on the office door. Sunset Oil Refining Company had possession of the patents and patent applications; the water separating process in the treatment of oil under patent No. 890,762, had been used commercially under license from Sunset, in the plant erected by Sunset on the Rice Ranch Oil Company lease, and the purchasers were informed of that; a new plant had been erected by Sunset at Ostend and the continuous water separating process had been used there commercially by Sunset and the purchasers were informed of it; this process was then covered by patent application No. 529,049 and later was covered by patent No. 1,123,502.

During the conversations which took place before the patents were purchased, a routine inquiry into the books of Sunset Oil Refining Company would have shown that the inventions then the subject of the discussions were carried on the company's books as an asset of the value of $100,000. The same inspection would have shown the use of the inventions by Sunset under agreements with Dubbs. It all evidenced a proprietary interest of Sunset Oil Refining Company in the patents.

The evidence also shows that Leszynsky and Belknap had every opportunity to learn of the equitable rights and interests of Sunset Oil Refining Company in the patents and patent applications from the file of patent No. 1,123,502 in the patent office. The file wrapper and the documents in the file showed that the water separating process had been developed and used in the refining plants of Sunset Oil Refining Company. The same was true in the case of Patent No. 1,100,717. Those files also revealed that many of the other patented processes involved in the transfer had been developed and used in the same circumstances; also that Jesse A. Dubbs was the president of the company all of that time and that Carbon P. Dubbs had been active in the development work of the company.

In the option agreement of November 15, 1913, Jesse A. Dubbs agreed to give Belknap full power of attorney in the matters of the 1,123,502 patent and the 1,100,717 patent. This Dubbs did and Belknap filed the documents in the patent office. The purpose of the power of attorney was to enable Belknap to determine whether the claims in the application for patent No. 1,123,502 could be broadened so as to cover beyond question the Burton cracking process of the Standard Oil Company of Indiana. Belknap concluded that it was possible to do so before the option to purchase the patents was exercised.

The legal effect of the use and possession of the patents by Sunset Oil Refining Company, of which Leszynsky and Belknap had actual knowledge, is stated in the case of Prime et al. v. Brandon Manufacturing Co., C.C.Vt.1879, 19 Fed.Cas. page 1324, No. 11,421. At page 1328, the Court said:

"but the legal title to a patent may be in one person, and the equitable right to it in another";

and at page 1325:

"This use by the defendant was possession of the monopoly, as far as that use extended, at least, which is as far as this controversy, embraced in the original bill, extends; and this possession, when actually known, was constructive notice of the claim of right under which the possession and use were had, the same as the possession of land is notice to a purchaser of the legal title of any equitable right which the possessor may have. 1 Story, Eq.Jur. § 400; Pinney v. Fellows, 15 Vt. 525. Had they inquired by what right the use of these patented inventions was had, they would

probably have learned the truth about it, and must now stand as if they had enquired and learned it".

Defendants, in arguing that they did not have knowledge of the interest of Sunset Oil Refining Company in the patents, admit the correctness of the rule announced in Frime et al. v. Brandon Manufacturing Co., 19 Fed.Cas. 1324, No. 11,421, that possession is constructive notice of a claim of right. They insist, however, that Belknap made reasonable inquiry in regard to ownership of the patents by way of information that was given to him by J. A. Dubbs, C. P. Dubbs, and L. A. Dubbs. The Court believes that the Dubbs family was the source least likely to give accurate information concerning ownership of the patents. Defendants also contend that although Belknap knew that Rice Ranch Oil Company had operated under patent No. 1,123,502, inquiry there would have been useless because those operations were under a license and that a bona fide purchaser could not cut off the rights of a licensee to use the patents. They also say that the fact that Belknap was given a power of attorney in the application proceedings for patent No. 1,123,502 and also for patent No. 1,100,717, affords no basis for inferring that he read the interference record in those proceedings, which proceedings were replete with information that was furnished by J. A. Dubbs and C. P. Dubbs to show the connection of Sunset Oil Refining Company with that patent. Defendants ask: should Belknap have inquired of Mary Belle Hardison who either did not know of her rights or if she did, she has slept on them since? The Court believes that Belknap and defendants should have inquired into the books and records of Sunset Oil Refining Company and then of Mary Belle Hardison. Such inquiry would have settled once and for all the question of whether anyone other than Jesse A. Dubbs claimed an interest in the ownership of the patents.

With the foregoing evidence pointing persuasively to knowledge and notice, on the part of the defendants, of the equitable interest of Sunset Oil Refining Company in the patents, they maintain steadfastly that they knew of nothing to controvert the representations of Jesse A. Dubbs that he was the owner of the patents. They contend, first, that Dubbs was the owner of the record title to the patents. But under the authorities cited, the circumstances which surrounded the purchase of the patents dispelled the force of the record title. Second, that Dubbs represented to them that he owned the patents. The representation that Dubbs was the inventor and sole owner was included in the following documents: (1) The option agreement dated November 15, 1913; (2) the agreement between Leszynsky, Dubbs and Dunham wherein Leszynsky exercised the option to purchase; and (3) the written assignment of the patents by Dubbs to Dunham dated May 15, 1914. Those representations serve to confirm the Court's belief that the purchasers regarded the ownership of the patents as of paramount importance. However, such representations by Dubbs would not permit the purchasers to ignore other evidence that pointed to and was consistent with the equitable interest of Sunset.

The Court believes, and finds that the evidence related thus far proves conclusively that when Leszynsky and Belknap purchased the patents and patent applications from Jesse A. Dubbs, they both had actual knowledge of the equitable interest of Sunset Oil Refining Company in the patents and inventions. Both of those men were familiar with patents. Belknap was a patent attorney and he undoubtedly was familiar with the legal possibility of the equitable title to patents resting in parties other than the holder of the record title.

On the strength of the knowledge of Leszynsky and Belknap of Sunset's interest in the inventions before they were transferred to Universal Oil Products Company in 1914 and the three hundred shares of Universal stock were issued to Jesse A. Dubbs, trustee, plaintiff invokes the principle of law that knowledge of one member of a syndicate or of its attorney is knowledge of all, and that the knowledge of all the promoters of a corporation is imputed to the corporation. Plaintiff contends that the knowledge of Leszynsky and Belknap, therefore, is imputed to the Universal Oil Products Company, of South Dakota; and consequently, that all of the defendants,

including Universal, became constructive trustees for the benefit of the minority stockholders of Sunset Oil Refining Company, of all the patents and inventions which were transferred to Universal Oil Products Company and of all of the capital stock issued by it as well as the profits which were earned thereon.

The principle of a constructive trust in regard to all of the inventions and the stock and profits of Universal for which plaintiff contends is illustrated in the decisions in Southern Pacific Company v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099, and Winger et al. v. Chicago City Bank and Trust Company, etc., et al., 325 Ill.App. 459, 60 N.E.2d 560; Id., 394 Ill. 94, 67 N.E.2d 265. Plaintiff argues that after the patents were transferred to Universal and that company had issued its capital stock in consideration of the patents transferred, the position of Mary Belle Hardison as a minority stockholder of Sunset Oil Refining Company was particularly analogous to the position of similar minority stockholders in Southern Pacific Company v. Bogert. There the majority stockholder of a railroad company organized a new railroad company. The majority stockholder was a corporation and it caused the equipment and rights of way of the old company to be transferred to the new company and also supplied the new company with additional capital. The new company then issued all of its stock to the majority stockholder of the old company. In holding that there was a constructive trust of the stock of the new company in favor of the minority stockholders of the old company, the Court said at pages 487, 488 of 250 U.S., at page 535 of 39 S.Ct., 63 L.Ed. 1099:

"The minority stockholders do not complain of a wrong done the corporation or of any wrong done by it to them. They complain of the wrong done them directly by the Southern Pacific and by it alone. The wrong consists in its failure to share with them, the minority, the proceeds of the common property of which it, through majority stockholdings had rightfully taken control. In other words, the minority assert the right to a pro rata share of the common property; and equity enforces the right by declaring the trust on which the Southern Pacific holds it and ordering distribution or compensation. The rule of corporation law and of equity invoked is well settled and has been often applied. The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors. If through that control a sale of the corporate property is made and the property acquired by the majority, the minority may not be excluded from a fair participation in the fruits of the sale."

In the Southern Pacific Company case the minority stockholders of the old railroad company ratified the transfer of assets to the new company and merely sought their share of the proceeds from the property.

The case of Winger et al. v. Chicago City Bank and Trust Company, etc., 325 Ill. App. 459, 60 N.E.2d 560, involved a fraudulent transfer of the assets of a mutual insurance company by two of its directors, to a new stock company by means of the new company reinsuring the policies of the mutual company. The Court held back that all of the stock of the new company was impressed with a trust in favor of the mutual company and its members. The principle relied on by plaintiff in the instant suit is stated at page 477 of 325 Ill.App., at page 568 of 60 N.E.2d:

"The company stock that Martin and Sawyer obtained stands as the product of their faithless conduct;. the value behind the stock they received was the goodwill, agency contracts, and other intangibles which inevitably merged in those certificates of stock. To say that the certificates of stock thus representing the advantage that Martin and Sawyer received can be withheld from the association and its members would be to hold that equity was barred by a mere form, and would be to say that the form of the transaction that Martin and Sawyer used was a cover and a shield for their fraud."

Plaintiff also cites Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418; Jackson v. Ludeling, 21 Wall. 616, 88 U.S. 616, 22 L.Ed. 492; L. A. Young Spring & Wire Corp. v. Falls, 1943, 307 Mich. 69, 11 N.W.

2d 329; In re Van Sweringen Company, 6 Cir., 119 F.2d 231.

Defendants argue that even if Belknap, before the patents were purchased, was chargeable with actual or constructive notice of the record of the interference proceedings which were then on file as a part of the patent, No. 1,100,717 and patent No. 1,123,502 proceedings in the patent office, such knowledge cannot be imputed to Universal Oil Products Company. The reason given is that Belknap would have acquired such knowledge in June of 1913, an entire year before he became attorney for Universal when it was organized in June, 1914.

The general principle relied on by defendants is that when an agent has acquired information before the commencement of his agency, the principal will not be charged with constructive notice thereof. Snyder v. Partridge et al., 138 Ill. 173, 29 N.E. 851, 32 Am.St.Rep. 130; Burton et al. v. Perry et al., 146 Ill. 71, 34 N.E. 60. The rule is stated in Snyder v. Partridge at page 184 of 138 Ill., at page 853 of 29 N.E., 32 Am. St.Rep. 130:

"It is a general rule that, where an agent has acquired information before the commencement of his agency, the principal will not be charged with constructive notice thereof. One reason of the rule is that no man can be supposed always to carry in his mind the recollection of former occurrences. Hood v. Fahnestock, 8 Watts [Pa.] 489, [34 Am.Dec. 489]. Another reason is that, where the agent is an attorney or counsel, it might be contrary to his duty to reveal the confidential communications of his client. Id; also, McCormick v. Wheeler, 36 Ill. 114 [85 Am.Dec. 388].

"But the rule, that the knowledge of the agent must be acquired during his agency, and in the course of the same transaction from which the principal's rights and liabilities arise, in order to affect the principal with notice, has no application where it is clear from the evidence that the information obtained by the agent in a former transaction was so precise and definite that it is or must be present to his mind and memory while engaged in the second transaction, (2 Pom. Eq. Jur. § 672, and cases cited in note,) and where the agent is at liberty to communicate his information to the principal."

The Court held that the principal for whom Partridge bought the property came within the exception to the rule and was chargeable with the knowledge that Partridge had obtained relative to the existence of Synder's unrecorded mortgage on the property.

In Burton et al. v. Perry et al., 146 Ill. 71, 34 N.E. 60, the Court held that a principal was not chargeable with the knowledge his agent might have obtained from a casual conversation that occurred five years before the agency commenced.

In the instant suit, negotiations to purchase the patents commenced in June, 1913, were concluded in November, 1913, and Universal Oil Products Company was organized in June, 1914.

■ Where a group of promoters buy patents or patent applications with the aim of organizing a corporation for the purpose of holding title to the patents and establishing the validity and commercial usefulness of the patents through the prosecution of an infringement suit against one of the great oil companies and the corporation is organized and receives the patents within one year from the start of the negotiations and within less than one year after they were purchased, the presumption is overwhelming that the facts concerning ownership of the patents of which the promoters had knowledge when they purchased the patents were present to their minds and memories when they organized the corporation to receive title to the patents and to prosecute the infringement suit; especially since Leszynsky became president of the company and Belknap its attorney.

■ The investigation of the patents and who owned them, the purchase of the patents and the organizing of a corporation was one continuous transaction. The promoters had to have knowledge of the same vital facts when Universal Oil Products was formed that were present in their minds when they purchased the patents from Jesse A. Dubbs. Clearly, this situation comes within the exception to the rule under the holding in Snyder v. Partridge et

al., 138 Ill. 173, 29 N.E. 851, 32 Am.St.Rep. 130.

Thus, before Universal Oil Products Company of South Dakota was organized, Leszynsky and Belknap had actual knowledge of facts that, under sound legal principles, established the interest of Sunset in the patents. Continental Windmill Co. v. Empire Windmill Co. et al., 6 Fed.Cas. 336, No. 3,142; Prime et al. v. Brandon Manufacturing Company, 19 Fed.Cas. 1,324, No. 11,421; Stanton Manufacturing Co. v. McFarland, N.J.Ch., 1895, 30 A. 1058, affirmed 53 N.J.Eq. 649, 33 A. 962, 51 Am. St.Rep. 647. And that knowledge must be imputed to Universal Oil Products Company of South Dakota. Snyder v. Partridge, et al., 138 Ill. 173, 29 N.E. 851, 32 Am.St. Rep. 130.

But coming closer to the liability of the defendants in the instant suit, the evidence shows that Universal Oil Products Company of South Dakota, after its organization, is chargeable at least with constructive knowledge, and the Court believes with actual knowledge, of the equitable rights and interests of Sunset Oil Refining Company in the patents and patent applications that had been transferred to Universal.

The principles of constructive knowledge are stated in Simmons Creek Coal Company v. Doran, 142 U.S. 417, 12 S. Ct. 239, 35 L.Ed. 1063. There the Court, at page 439 of 142 U.S., 12 S.Ct. at page 246, 35 L.Ed. 1063, said:

"Vice-Chancellor Wigram in Jones v. Smith, supra [1 Hare 43], laid it down that cases in which constructive notice had been established, resolved themselves into two classes: First, those in which the party charged had actual notice that the property in dispute was in some way affected, and the court has thereupon bound him with constructive notice of facts to a knowledge of which he would have been led by an inquiry into the matters affecting the property, of which he had actual notice; and, secondly, those where the court has been satisfied that the party charged had designedly abstained from inquiry for the purpose of avoiding notice. If there is not actual notice that the property is in some way affected, so that the case does not fall within the first class, and no fraudulent turning away from a knowledge of facts which the res gestae would suggest to a prudent mind, or gross and culpable negligence, so as to bring it within the second, then the doctrine of constructive notice would not apply."

Sometime in 1914, after Jesse A. Dubbs had transferred the patents to Dunham and at about the time that Universal of South Dakota was organized, Jesse A. Dubbs had an opportunity to sell the water separating plant of Sunset Oil Refining Company at Ostend to Radiant Lubricants. However, because the patents had been sold and transferred to Universal, the plant was then without a process to use in treating oil. To enable the plant to operate, Leszynsky allowed Dubbs to substitute the Culmer process. The Culmer process was owned by the Standard Asphalt and Rubber Company, of which Leszynsky was president.

As soon as the Culmer process was made available, Dubbs sold the water separating plant to Radiant Lubricants, apparently without the knowledge or consent of Universal Oil Products Company, its officers, or its promoters. The sale was treated as a near catastrophe. For a year or more after that, Universal, through its employees, tried to buy or lease back the plant. The admitted purpose was to prevent outside parties from learning that the Dubbs water separating process had been used there. The efforts to recover the plant stopped when it was learned that the plant had been virtually abandoned.

Also, by 1917 or 1918, the officers of Universal Oil Products Company had obtained possession of many of the books and records of Sunset Oil Refining Company as well as its correspondence. The Court presumes that Universal and its officers learned from those records the facts that appeared there, namely, the rights and interests of Sunset Oil Refining Company in the inventions that had been acquired by Universal Oil Products Company.

But proof that does not require presumption in order to establish the actual and constructive knowledge of the Universal Oil Products Company and its officers in

regard to the ownership of the patents and inventions when they were transferred to the company, is found in the fulfillment of the very purposes for which the company was organized. The industry of the company and its attorneys that was put forth, first to broaden the claims in patent No. 1,123,502 so as to cover the "Burton process" and later in the successful prosecution of the infringement suit against the Standard Oil Company of Indiana, forced the Universal people into the possession of facts shown in the patent files that pointed directly to the interest of Sunset Oil Refining Company in the patents. The factual history of patent No. 1,123,502 as well as the real ownership of the patent were vitally necessary in the prosecution of the infringement suit. Whether Universal and its attorneys made the inquiry indicated into the facts thus forced upon them, as they were bound to do under the holding in Simmons Creek Coal Co. v. Doran, 142 U.S. 417, 12 S.Ct. 239, 35 L.Ed. 1063, is attested by the successful outcome in both proceedings.

 Therefore, the Court finds that Universal Oil Products Company of South Dakota and its agents acquired actual and constructive knowledge, after the organization of the company, of the equitable interest of Sunset Oil Refining Company in the patents.

But notwithstanding the knowledge of Universal and its agents in regard to Sunset's interest in the patents, the Court does .not believe that such knowledge impressed a constructive trust on all of the patents transferred to Universal by Dubbs and on all of the stock that was issued by the company, even though the stock was issued in consideration of the patents transferred.

 Jesse A. Dubbs, as constructive trustee of the assets of Sunset Oil Refining Company for the benefit of minority stockholders, made a fair deal, one which plaintiff is seeking to confirm, if Dubbs acted for Sunset when he sold the patents. He sold a seven-tenths interest in the patents for $22,500 and the agreement by Leszynsky to advance money to exploit the patents. Under the same agreement, if a cor-

poration was formed, Leszynsky was to receive seventy per cent of the stock and Dubbs was to receive thirty per cent. Universal Oil Products Company was formed and Dubbs traded the three-tenths interest for three hundred shares of the company's stock. He expressly acknowledged the trust in regard to the three hundred shares when the certificate was issued to Jesse A. Dubbs, trustee. To this point, Universal and its officers may not have been subject to criticism. The deal was one which promised to be profitable to the holders of the three hundred shares of Universal stock. This is the deal which plaintiff has asked the Court to confirm and recovery, if any, must be limited to that.

Turning to plaintiff's contention that Universal of South Dakota and its officers are liable to the plaintiff because they participated in the violation of a trust when the company transferred the three hundred shares of stock from the record holder, Jesse A. Dubbs, trustee, to Hiram J. Halle, who was acting as agent for J. Ogden Armour.

Of course, Universal Oil Products Company is answerable for the knowledge it had and for what that company itself did. Whether the three hundred shares of stock were issued to Jesse A. Dubbs, trustee, at his request or not, it was conclusive proof to the parties concerned, that Dubbs did not consider himself to be the sole owner of the stock. Somebody else had an interest therein.

The defendants answer that Jesse A. Dubbs requested the stock to be issued to him as trustee and that this fact merely confirmed an understanding that C. P. Dubbs had a claim to the stock as indicated by the memorandum of November 20, 1913; that in the ensuing years both of these men advised Universal Oil Products Company and its officers that Jesse A. Dubbs was holding an undetermined part of his stock in trust for C. P. Dubbs; and that the issuance of the stock to Dubbs as trustee did not suggest the thought that Sunset Oil Refining Company might have a claim to the stock. However, a review of the part that Universal Oil Products Company played in the history of the three hundred shares will demonstrate the lack of any

factual basis for the contention that the corporation and its officers believed that C. P. Dubbs was the beneficiary of the trust that was thus declared and acknowledged by Jesse A. Dubbs.

Apparently, when Jesse A. Dubbs and Leszynsky signed the option agreement on November 15, 1913, C. P. Dubbs had not advanced a claim to the patents, although he initiated the negotiations which resulted in that agreement. The option contemplated the transfer of a seven-tenths interest in the patents without mention of any claim by C. P. Dubbs to that partial interest. When the option was exercised by the trust agreement of May 14, 1914, Leszynsky paid $22,500 to Jesse A. Dubbs, presumably as a part of the purchase price of the seven-tenths interest, without recognizing or obtaining a release of a claim thereto by C. P. Dubbs. It does appear in the evidence that from the money paid to Jesse A. Dubbs, he paid the sum of $2,500 to C. P. Dubbs.

Jesse A. Dubbs died on December 15, 1918. In his will, he named his wife, Jennie C. Dubbs, who also was a director of Sunset Oil Refining Company, as his residuary-legatee and she was appointed executrix of Dubbs' estate. The three hundred shares of Universal stock were inventoried as a part of the estate.

On July 9, 1919, C. P. Dubbs filed a claim against his father's estate for one half of the three hundred shares of Universal stock that had been issued to Jesse A. Dubbs, trustee. The claim was based on the written memorandum dated November 20, 1913. It was rejected by his mother as executrix and the estate records show that the claim never was allowed.

On October 25, 1919, Universal Oil Products Company and C. P. Dubbs entered into a written agreement whereby the latter assigned to Universal his alleged claim to one-half of the three hundred shares of stock under the memorandum dated November 20, 1913. He also assigned his interest in certain other patents and patent applications. (The memorandum of November 20, 1913, referred only to the two water separating patents.) Universal agreed to pay C. P. Dubbs the sum of $25,000 plus a royalty of 15 per cent of its net earnings

and income with the right in Universal to capitalize the royalty by issuing to C. P. Dubbs fifteen per cent of its capital stock.

Thereafter, Universal, through its president, Hiram J. Halle, who also was acting as agent for J. Ogden Armour, entered into negotiations with Jennie C. Dubbs, for the purchase of the three hundred shares of Universal stock that was then in the estate of Jesse A. Dubbs. In these negotiations, neither Universal nor Halle ever mentioned to Mr. Dubbs the claim of C. P. Dubbs or the assignment of it to Universal.

On November 5, 1919, Halle and Jennie C. Dubbs executed an option agreement whereby Halle was given a five year option to purchase from Mrs. Dubbs individually, for the sum of $95,000 the three hundred shares of stock which had been issued to Jesse A. Dubbs, trustee. As consideration for the option, Halle agreed to pay Mrs. Dubbs $15,000 in cash and $250 per month until the option was exercised. Mrs. Dubbs agreed to and later did secure distribution of the three hundred shares to her. She endorsed the certificate individually and also as executrix of the estate of Jesse A. Dubbs and delivered the stock to an escrow agent. A new certificate for the three hundred shares was then issued by Universal to the escrow agent. The old certificate was not endorsed by a successor trustee.

In that transaction, Universal did not purchase the stock. In reality Halle bought an option to purchase on behalf of Armour. The purchase was to be from Jennie C. Dubbs as an individual and not as a successor trustee. The legal aspect of the stock then being the subject of a trust, of which Universal and its officers admittedly had knowledge, was entirely ignored. Also ignored was the fact that Universal had purchased the alleged claim of C. P. Dubbs to the same stock.

On November 26, 1919, Universal, by action of its board of directors, approved the escrow transaction and ratified a waiver of restrictions against the sale of the stock which had been executed by Halle for the company.

In April, 1923, Halle exercised the option and thereafter a new certificate for the three hundred shares, which had been sold

by Jennie C. Dubbs, individually and not as a successor trustee, was issued by Universal Oil Products Company to Halle who then held the stock as agent for J. Ogden Armour. This certificate replaced the certificate which had been issued to the escrow agent. The latter certificate replaced the one which previously had been issued to Jesse A. Dubbs, trustee.

At this point, Universal Oil Products Company participated in the destruction of a trust of which it had actual knowledge and in the conversion of the subject matter of the trust. The company and its officers knew that the original certificate for the three hundred shares was issued to Jesse A. Dubbs as trustee. They approved the escrow agreement for the purchase of that stock by Halle and Armour, persons who had no claim whatever to the stock when it was issued to a trustee. They knew that the escrow agreement had excluded any claim on the part of C. P. Dubbs to the stock. They issued the new certificate to persons who were influential in Universal Oil Products Company rather than to the company itself, or to C. P. Dubbs. Without lifting a finger to ascertain the real owners of the three hundred shares of stock, they allowed them to be converted by issuing a new certificate for the stock to men who were strangers to the stockholders of Sunset Oil Refining Company when the inventions were developed and who did not profess to have any claim against Jesse A. Dubbs when he openly received the stock as trustee.

Before dealing with the duty of Universal Oil Products Company to prevent the destruction of a trust of which it had knowledge and the alienation of the trust funds, the rest of the history of the three hundred shares of stock can be given in a few words.

In 1925, J. Ogden Armour was in extreme financial difficulties. Because of a pressing need for money, he sold his entire five hundred shares of Universal Oil Products Company stock to his wife, Lolita Sheldon Armour, for the sum of $1,500,000, and she borrowed that sum from the Illinois Merchants Trust Company of Chicago, and delivered it to her husband in payment for the stock. The five hundred shares

which Armour sold to his wife included the three hundred shares which had been purchased from Jennie C. Dubbs.

On December 1, 1925, Universal Oil Products Company issued a certificate for 499 shares to Mrs. Armour.

Later, in 1928, in a transaction that was unrelated to the issuance of the three hundred shares of Dubbs stock to Halle and then to Mrs. Armour, all of the stockholders of Universal Oil Products Company handed over to that company fifteen per cent of their respective holdings of Universal stock and Universal, in turn, issued one hundred and fifty shares of its stock to C. P. Dubbs. Sound reasons for the turning over to Universal of fifteen per cent of the stock held by each stockholder does not appear in the evidence. One fact, however, is plain. The fifteen per cent that was turned over by Mrs. Armour was not the fifty per cent of the profits that was stipulated in the memorandum signed by Jesse A. Dubbs on November 20, 1913.

In 1931, the stockholders sold the entire 1,000 shares of Universal stock to United Gasoline Corporation for the total sum of $25,000,000. Afterward a new company with the name Universal Oil Products Company, was organized under the laws of the State of Delaware. This company has since purchased the principal assets of the defendant, Universal Oil Products Company of South Dakota, under an agreement whereby the Delaware corporation assumed all of the liabilities of the South Dakota company.

The Court believes that the collection and turnover of Universal stock to C. P. Dubbs in 1928, was the final step in a superficial solution of a problem which Universal stockholders feared might involve all of the inventions and patents then held by the Universal Oil Products Company and all of the company's capital stock as well.

When Halle and Armour purchased the three hundred shares of Universal stock from Dubbs' widow in 1923, title thereto was more apparent than real. They purchased the stock from Jennie C. Dubbs as an individual as distinguished from a successor to the trustee inscribed upon the certificates. If Halle or Armour or the Universal Oil Products Company believed

that fifty per cent of that stock belonged to C. P. Dubbs under the memorandum of November 20, 1913, they did not allow it to reach his hands. Armour, acting through Leszynsky, was privy to the original option agreement for the sale of the inventions and patents by Dubbs in 1913. Halle was president of the Universal Oil Products Company since shortly after it was organized. Armour was a stockholder in, and the one who, through Leszynsky, conceived the organization of Universal Oil Products Company when the patents were finally acquired from Jesse A. Dubbs in 1914. Together, Halle and Armour controlled Universal in 1923, when they purchased the Dubbs stock.

Contrariwise, when the Universal Oil Products Company purchased the alleged claim of C. P. Dubbs in 1919, that company supposedly acquired from C. P. Dubbs some right to the Universal stock that had been issued to Jesse A. Dubbs as trustee; that is, unless C. P. Dubbs' claim was spurious and his right to a portion of the stock did not exist.

In 1923, when Halle, acting for Armour, exercised the option agreement with Jennie C. Dubbs and purchased the three hundred shares then standing in the name of Jesse A. Dubbs, trustee, he ignored the claim of C. P. Dubbs which had been assigned to Universal. Halle bought the stock for Armour as an individual. Universal Oil Products Company had previously transferred on its own records the title thereto from Jesse A. Dubbs, trustee, to the escrow agent and when the purchase had been completed, it again transferred the stock on its records from the escrow agent to Halle as agent for Armour and issued certificates therefor. Thus, when the stock was transferred by Universal from Jesse A. Dubbs, as trustee, the transfer was admittedly made by Universal free of any claim of C. P. Dubbs or of Universal Oil Products Company as assignee of C. P. Dubbs. If the company, as assignee of the alleged claim of C. P. Dubbs, had then held any valid claim to the stock, it must be presumed that the company would have asserted the claim against the stock. Certainly this Court cannot indulge in the presumption that the company and its officers intended to forfeit to Armour as a gift, a claim that it could have asserted against the Dubbs stock. The defendants do not so contend.

The Court concludes that in 1919, when the option agreement with Jennie C. Dubbs was executed and in 1923, when the Dubbs stock was purchased by Halle for Armour, Universal Oil Products Company, Halle and Armour did not believe that the company then held a valid claim against the Dubbs stock or that C. P. Dubbs ever had had a valid claim to that stock. Having shown its disbelief in the claim of C. P. Dubbs to the three hundred shares of Dubbs stock in 1919 and in 1923, the defendant Universal Oil Products Company of South Dakota cannot now assert the same claim in defense of an action brought by the minority stockholders of Sunset Oil Refining Company to recover a share of the proceeds which have been realized from the stock.

Therefore, the contention of defendant Universal Oil Products Company of South Dakota, that it did not have knowledge at least by 1919, of all the facts and circumstances, heretofore reviewed herein, which imparted actual knowledge of the equitable interest of Sunset Oil Refining Company in the patents and patent applications purchased by Leszynsky for Universal in 1914, fails. The Court finds that the said defendant did have actual and constructive knowledge of the facts which gave notice of the interests of the stockholders of Sunset Oil Refining Company in the Universal stock issued in the name of Jesse A. Dubbs, trustee, when that stock was transferred to the escrow agent in 1919 and then to Halle as agent for Armour in 1923. And the Court finds that Mary Belle Hardison did have an interest in that stock. Dowse v. Federal Rubber Co., D. C., 254 F. 308; Southern Pacific Company v. Bogert et al., 250 U. S. 483, 39 S.Ct. 533, 63 L.Ed. 1099.

The Court believes that it is probable that the deal of October 25, 1919, between C. P. Dubbs and Universal Oil Products Company was prompted by the concern of Universal and its stockholders over claims that might arise in the future to the ownership of all of the patents that were trans-

ferred by Jesse A. Dubbs to Universal and all of the stock that had been issued by Universal. This conclusion is confirmed by the fact that in 1928, the stockholders of Universal Oil Products Company, individually, as distinguished from the corporation, turned over for C. P. Dubbs fifteen per cent of their respective stock holdings. If the corporation, on its own, ever discharged the agreement of October 25, 1919, with C. P. Dubbs, it was not done openly.

It appears that C. P. Dubbs also was apprehensive in respect of possible claims to the Universal stock that was turned over to him in 1928. He sought and obtained his dismissal as a defendant in this suit for lack of jurisdiction. He resides in Bermuda. Although he retains citizenship in the United States, he disclaims residence or citizenship of any state in the Union.

Now as the liability, if any, which defendant Universal Oil Products Company, of South Dakota, assumed when it transferred on its records the three hundred shares of its stock away from Jesse A. Dubbs, trustee.

■■■ The Court is of the opinion that, apart from the other grounds on which plaintiff seeks to establish the joint liability of all defendants, the defendant, Universal Oil Products Company of South Dakota, did become liable to Mary Belle Hardison, as a minority stockholder of Sunset Oil Refining Company, when it permitted the transfer of the three hundred shares of its stock from Jesse A. Dubbs, trustee, to Halle.

■■■ A corporation that has actual and constructive knowledge of an equitable interest of a third party in its own stock then standing in the name of a trustee, cannot permit a transfer of the stock in violation of the trust. The legal principles that govern the transfer of stock standing in the name of a trustee are stated in Fletcher Cyclopedia Corporations, Vol. 12, page 479, Section 5546:

"If the corporation has actual or constructive notice that the stock is held in trust, it becomes its duty to use reasonable diligence to ascertain whether the trustee has authority to transfer the stock before permitting the transfer to be made, and it will be liable to the cestui que trust, if without inquiry, it permits a transfer in violation of the terms of the trust. The legal presumption is that a trustee has no power to sell or to transfer the stock held by him in his fiduciary capacity, nor have his powers been enlarged by the Uniform Stock Transfer Act, and the fact that he holds it as trustee is a warning and a declaration to all the world that he is without the power of disposition, unless that power is specifically given by the instrument creating the trust, or by the assent of those whom he represents."

The rule is further stated in Fletcher Cyclopedia Corporation, Vol. 12, page 507, Section 5552:

"Where a corporation acts in good faith and without negligence in allowing a transfer by one who appears to be the absolute owner of shares, it is not liable to one having a mere equitable title by virtue of a prior unregistered transfer, or otherwise, of which it has no notice. But it is liable if it has actual notice of the equitable title, or if the form of the certificate or other circumstances are sufficient to put it upon inquiry. These principles apply to transfers by persons holding the title to shares as trustees, executors or guardians."

The rule stated above has been followed in the decisions of the courts of a majority of the states as well as in the decisions of the Federal Courts.

The defendants contend that the evidence shows that Universal and the other defendants did not have either actual or constructive knowledge of any equitable interest in the Dubbs patents, and that the word "trustee" which appeared in the certificates that were issued to Jesse A. Dubbs did not impose any duty on Universal to make inquiry at the time the shares were transferred, or if a duty did exist, it was satisfied by inquiring of the holders of the stock as to the meaning of the term, under the authorities in the states of South Dakota, California, and Illinois and in other states. Rua v. Watson, et al., 13 S.D. 453, 83 N.W. 572; Thompson v. Toland, 48 Cal. 99; Fletcher v. Kidder, 163 Cal. 769, 127 P. 73; Illinois Uniform Fiduciaries Act, Section 3, Ill. Stat. 1945, p. 2295, c. 98 § 236; Mudge v..

Mitchell Hutchins & Co., 322 Ill.App. 409, 54 N.E.2d 708; Mercantile Nat. Bank v. Parsons, 54 Minn. 56, 55 N.W. 825, 40 Am.St.Rep. 299; Crigler v. Rouse, Trustee, 209 Ky. 439, 272 S.W. 905.

So far as the mere addition of the word "trustee" in the Dubbs certificates of stock is concerned, the authorities cited by the defendants are persuasive on the proposition that an inquiry of the person holding the stock as trustee would satisfy the rule stated in Fletcher Cyclopedia Corporations, if the answer to the inquiry gave reasonable and plausible grounds for the transfer and fairly showed, in the circumstances, that a trust was not being violated. The same authorities might also be construed perhaps to mean that no duty is imposed on a corporation to see that a transfer of its stock issued to a trustee does not violate a trust, if it did not know of the trust. The substance of defendant's argument is summed up in the following statement in their brief:

"Thus, where property stands in the name of one as trustee, but neither the beneficiary nor anyone else who might have known of the true facts is identified, inquiry of the trustee is sufficient. The purchaser's duty to inquire is satisfied if, upon such inquiry from the trustee, the latter offers a plausible explanation of the word 'trustee' even though the explanation furnished by the trustee ultimately proves false."

However, in the instant case the Court has found that the defendant, Universal Oil Products Company of South Dakota, and its officers had actual and constructive knowledge of the equitable interest of Sunset Oil Refining Company in the stock issued to Jesse A. Dubbs, trustee, before it was transferred by Jennie C. Dubbs to the escrow agent in 1919, and by the escrow agent to Halle in 1923. This purchase was not from Jesse A. Dubbs, the trustee, but from his widow as an individual and as executrix of Dubbs' estate, who claimed the stock as her own. The purchaser was not an innocent third party but the president of the defendant company who represented Armour. Armour promoted the original purchase of the patents from Sunset Oil Refining Company and he caused the defendant company to be organized and financed. Halle became an officer of the defendant company in 1916 and he must have become familiar with the facts that had come to the knowledge of the company. Here the defendant company not only permitted a transfer of its stock in violation of a trust of which it had knowledge but it participated in a breach of that trust and must respond to the plaintiff.

Even under the authorities cited by the defendants, a corporation is liable when it permits stock to be transferred in violation of a trust of which it has knowledge or itself participates in such a breach.

Therefore, I find and conclude that the plaintiff should recover against defendant Universal Oil Products Company, a South Dakota corporation, to the extent of plaintiff's interest in the three hundred shares of Universal stock that were issued to Jesse A. Dubbs, trustee.

As previously stated, defendant Universal Oil Products Company of Delaware was organized as a corporation under the laws of the State of Delaware in 1931 and it purchased substantially all of the assets of the defendant Universal Oil Products Company of South Dakota under a written agreement dated January 1, 1932. By the terms of the contract, Universal of Delaware agreed to pay all the liabilities and obligations of Universal of South Dakota. Universal of Delaware then issued one thousand shares of capital stock and distributed them ratably to the stockholders of Universal of South Dakota. The defendants have not disputed the liability of Universal of Delaware for any judgment that is recovered against Universal of South Dakota.

Therefore, I find and conclude that plaintiff should recover from defendant, Universal Oil Products Company of Delaware only to the extent to satisfying the amount of plaintiff's recovery against Universal Oil Products Company of South Dakota.

In the third and seventh causes of action of the Complaint as amended, plaintiff seeks to impose liability upon defendants Universal of South Dakota and Universal of Delaware on the ground that in 1928, Universal of South Dakota issued one hun-

dred and fifty shares of its stock to C. P. Dubbs in consideration of the transfer to the company of certain patents by C. P. Dubbs. Among the patents transferred by C. P. Dubbs in the agreement of October 25, 1919, were so-called "clean circulation" patents numbered 1,392,629 and 1,850,261. Plaintiff contends that the inventions covered by these patents were actually developed by Sunset Oil Refining Company and that the Sunset stockholders also had an interest in those patents and should recover a part of the consideration that was paid therefor.

The defendants admit that the water separating patent No. 1,123,502 was the only patent from which Universal of South Dakota derived any profit. Patent No. 1,123,502 was the one upon which the patent infringement suit against Standard Oil Company of Indiana was based and which assured the financial success of defendant Universal of South Dakota. The evidence shows that all of the Universal stockholders, rather than the company, contributed fifteen per cent of their stockholdings to C. P. Dubbs in 1928, and the Court is of the opinion that the purported transfer by C. P. Dubbs of patents Nos. 1,392,629 and 1,850,261 were of no more consequence to Universal of South Dakota and to the agreement of October 25, 1919, than was the claim of C. P. Dubbs to one-half of the three hundred shares of Universal stock that had been issued to Jesse A. Dubbs, Trustee. The Court's opinion of the reasons for that agreement has already been stated. The object of the agreement was to establish superficial color of title to the three hundred shares of the Dubbs stock in Hiram J. Halle, who acted as agent for Armour.

The Court believes that defendant Universal of South Dakota obtained the assignment from C. P. Dubbs on October 25, 1919, because Jennie C. Dubbs, who had been director of Sunset Oil Refining Company, was in a position to prove that the claim of C. P. Dubbs to the three hundred shares of Universal stock was invalid and spurious.

The Court also believes that C. P. Dubbs was able to obtain one hundred and fifty shares of Universal stock from Universal stockholders because if his demands had not been met, he would have furnished evidence that might have affected the title and rights of Universal of South Dakota to all of the patents that the company had acquired from Jesse A. Dubbs.

Therefore, as to plaintiff's third and seventh causes of action, the complaint will be dismissed for want of equity.

██ In the fourth and eighth causes of action of the complaint as amended, plaintiff seeks to recover a proportionate share of the increases in the capital stock of defendants Universal of South Dakota and Universal of Delaware under the provisions of the option agreement with Jesse A. Dubbs of May 14, 1914.

Universal of South Dakota did not increase its capital stock. The option agreement of May 14, 1914, by its terms, extended only to the corporation which was to be organized to receive title to the patents. When the stock of Universal of South Dakota was sold to United Gasoline Corporation, a bona fide purchaser, in 1931, the rights of Sunset Oil Refining Company under the option agreement ended. Consequently, any increases in the capital stock of defendant Universal of Delaware are not material to the issues of the instant suit.

The complaint as amended will be dismissed for want of equity as to the fourth and eighth causes of action.

██ In respect of the individual defendants, I find that plaintiff should not recover against any of them. Lolita Sheldon Armour was a bona fide purchaser of the stock she held. Carbon P. Dubbs was dismissed for want of jurisdiction. Hiram J. Halle was also dismissed as a defendant and he is now deceased. Joseph G. Alther acted only as an employee of Universal of South Dakota, in a ministerial capacity when the Dubbs stock was transferred to Halle. Robert J. Dunham was not an officer or director of the company when the Dubbs stock was transferred to Halle and he was not connected with the transaction. The rest of the defendants either did not have a stock interest in the company or were not associated with the management of the company when the transaction occurred.

■ The amount of plaintiff's recovery against defendants Universal Oil Products Company of South Dakota and Universal Oil Products Company of Delaware will be that proportion of the proceeds of the sale of three hundred shares of stock of Universal of South Dakota to United Gasoline Corporation at $25,000 per share and of the amount of all dividends that were paid on said three hundred shares prior to the sale thereof to United Gasoline Corporation, that is represented by the ratio of 150 to 750, with interest.

■ Defendants have devoted a large portion of their briefs to the argument that plaintiff's suit is barred by the statute of limitations and by laches. From the evidence the Court finds that defendant Universal Oil Products Company of South Dakota, and Frank L. Belknap, Hiram J. Halle and C. P. Dubbs, fraudulently concealed plaintiff's cause of action from Mary Belle Hardison and that this suit was timely brought.

The parties will prepare and present to the court for entry herein a decree that is not inconsistent with the terms of this memorandum.